*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF TUNUNAK, | ) | |
| | ) | Supreme Court No. S-14670 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-02236 PR |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6954 – September 12, 2014 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, and | ) | |
| H.S. and K.S., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: James J. Davis, Jr. and Sydney Tarzwell, Alaska Legal Services Corporation, Anchorage, for Appellant. Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. Kenneth C. Kirk, Anchorage, for Appellees H.S. and K.S. Notice of nonparticipation filed by Kristen C. Stohler, Stohler Law, P.C., Palmer, on behalf of Kathleen Wilson, Anchorage, Guardian Ad Litem. Heather Kendall-Miller, Erin C. Dougherty, and Matthew N. Newman, Native American Rights Fund, Anchorage, for Amicus Curiae Native Village of Kotzebue.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.
WINFREE, Justice, dissenting.

# I.   INTRODUCTION

This is the second appeal in a case that began in July 2008 when the Alaska Office of Children's Services (OCS) assumed custody of four-month-old Dawn[1] from her parents.[2] Dawn was found to be a child in need of aid (CINA).[3] Dawn's parents were Alaska Natives and thus the protections and requirements of the Indian Child Welfare Act (ICWA)[4] applied to the CINA case.[5] One of ICWA's provisions establishes preferences for foster care and adoptive placement of an Indian child with a member of the child's extended family, with other members of the child's tribe, or with other Indian families.[6] Native Village of Tununak (the Tribe) intervened in Dawn's CINA case and submitted a list of potential placement options for Dawn, including Dawn's maternal grandmother, Elise, who lives in the village.[7] Throughout much of the case, the parents and Tribe agreed there was good cause not to place Dawn with an ICWA preferred placement, and Dawn was eventually placed with the Smiths, non-Native foster parents who live in Anchorage.[8]

---

[1]   We use pseudonyms to protect the privacy of the parties involved.

[2]   *Native Vill. of Tununak v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 303 P.3d 431, 433 (Alaska 2013) (*Tununak I*).

[3]   *Id*.

[4]   25 U.S.C. §§ 1901-1963 (2012).

[5]   *Tununak I*, 303 P.3d at 433.

[6]   25 U.S.C. § 1915(a).

[7]   *Tununak I*, 303 P.3d at 433.

[8]   *Id*. at 434-35.

The superior court terminated Dawn's parents' parental rights at a September 2011 trial, making Dawn eligible for adoption.[9] The Tribe asserted that, given the termination of parental rights, there was no longer good cause to deviate from ICWA's placement preferences and objected to Dawn's continued placement in Anchorage.[10] In November the Smiths filed a petition to adopt Dawn.[11] At no point in the case did Elise file an adoption petition in the superior court.

The superior court conducted a placement hearing following the Tribe's objection to placement with the Smiths.[12] Following testimony by a number of witnesses, including Elise,[13] the court found that there was continued good cause to deviate from ICWA's adoptive placement preferences and again approved Dawn's placement with the Smiths.[14] The court then granted the Smiths' adoption petition in March 2012.[15] Dawn was almost four years old, and had lived with the Smiths for almost two and a half years.[16]

In separate appeals, the Tribe appealed both the superior court's order finding that there was good cause to deviate from ICWA's placement preferences and

---

[9]     *Id*. at 435.

[10]    *Id*.

[11]    *Id*.

[12]    *Id*. at 435-39.

[13]    *Id*. at 437-38.

[14]    *Id*. at 439-40.

[15]    *Id*. at 440.

[16]    *Id*. at 434, 440.

the adoption order.[17] We issued an order staying the adoption appeal while we considered the adoptive placement appeal.[18]

On June 21, 2013, we issued our decision in the first appeal that examined Dawn's adoptive placement with the Smiths.[19] We reversed the superior court's finding of good cause to deviate from ICWA's placement preferences.[20] Though we had held in previous cases that the preponderance of the evidence standard was the correct standard of proof, we were convinced by the Tribe's argument that the preponderance standard was inconsistent with Congress's intent in enacting ICWA, and that a higher standard of proof — proof by clear and convincing evidence — was required.[21] We overruled our prior cases and remanded the adoptive placement case to the superior court for it to take additional evidence and make its determination whether there was clear and convincing evidence of good cause to deviate from ICWA's adoptive placement preferences.[22] We continued our stay order of the adoption appeal.[23]

---

[17] *Id*. at 440 n.10.

[18] *Id*.; *see also Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012) (staying sua sponte the adoption appeal pending the resolution of the adoption placement appeal).

[19] *Tununak I*, 303 P.3d at 431.

[20] *Id*. at 453.

[21] *Id*. at 446-49.

[22] *Id*. at 453.

[23] *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012); *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, June 21, 2013) (ordering briefing on whether the stay of the adoption appeal should continue following the court's issuance of its opinion in the adoption placement appeal).

Four days after we issued our opinion in the adoptive placement appeal (*Tununak I*), the United States Supreme Court issued its opinion in *Adoptive Couple v. Baby Girl* (*Baby Girl*).[24] There, the Supreme Court held that ICWA "§ 1915(a)'s [placement] preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[25]

We asked the parties to provide supplemental briefing and oral argument on the effect of the Supreme Court's *Baby Girl* decision on the adoption appeal currently before us.[26] We now hold that because the United States Supreme Court's decisions on issues of federal law bind state courts' consideration of federal law issues — including the Indian Child Welfare Act — the decision in *Baby Girl* applies directly to the adoptive placement case on remand and to this adoption appeal. We discern no material factual differences between the *Baby Girl* case and this case, so we are unable to distinguish the holding in *Baby Girl*. Because the Supreme Court's holding in *Baby Girl* is clear and not qualified in any material way, and because it is undisputed that Elise did not "formally [seek] to adopt" Dawn in the superior court, we conclude that, as in *Baby Girl*, "there simply is no 'preference' to apply[,] [as] no alternative party that is eligible to be

---

[24] 133 S. Ct. 2552 (2013).

[25] *Id*. at 2564. The dissent argues that this portion of the opinion was dicta. We disagree. While "statements of a legal rule set forth in a judicial opinion do not always divide neatly into 'holdings' and 'dicta,' " *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 831 (2007) (Breyer, J., dissenting), in this case, the Court's *Baby Girl* opinion is divided into distinct sections considering three discrete subdivisions of ICWA: §§ 1912(f), 1912(d), and 1915(a). *See Baby Girl*, 133 S. Ct. at 2557. The Court's discussion of § 1915(a) is succinct and its holding unequivocal, *id*. at 2564-65, and we apply it to the facts of the present appeal.

[26] *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, Oct. 7, 2013) (ordering briefing and oral argument on the effect of *Baby Girl* on the adoption case).

preferred under § 1915(a) has come forward[,]" and therefore ICWA "§ 1915(a)'s [placement] preferences are inapplicable."[27]  We affirm the superior court's order granting the Smiths' petition to adopt Dawn and vacate our remand order in *Tununak I* requiring the superior court to conduct further adoptive placement proceedings.  We do not otherwise disturb our decision in *Tununak I*.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Dawn F. was born in Anchorage in March 2008.[28]  When she was four months old OCS assumed emergency custody and placed her in foster care in Anchorage.[29]  The Tribe formally intervened in Dawn's CINA case in August 2008 and submitted a list of potential foster placement options under Alaska Child in Need of Aid Rule 8(c)(7)[30] for Dawn, including placement with her maternal grandmother, Elise F.,

---

[27]    *Baby Girl*, 133 S. Ct. at 2564.

[28]    *Tununak I*, 303 P.3d at 433.

[29]    *Id*.

[30]    That rule states:

> Except to the extent otherwise directed by order or rule, [a tribe that has intervened in the proceedings] shall, without awaiting a discovery request, provide to other parties the following information, excluding any privileged material:
> . . . .
>
> . . . names and contact information for extended family of the child, a list of potential placements under . . . § 1915, and a summary of any tribal services or tribal court actions involving the family.
>
> Unless otherwise directed by the court, these disclosures shall be made within 45 days of the date of service of the petition for adjudication, or for tribes, the date of the order granting

(continued...)

who lived in Tununak.[31] Elise discussed foster placement at meetings with OCS in July and September 2008, but OCS ruled her out as a potential placement because an adult son living with her at the time had a barrier-crime for placement purposes.[32] OCS placed Dawn in a non-Native foster home to facilitate visitation with her mother, Jenn F., who lived in Anchorage.[33] In November 2008 the parties stipulated that there was good cause to deviate from ICWA's placement preferences, and in March 2009 the superior court found there was good cause to continue the deviation, as Jenn was progressing with her OCS case plan and it appeared she might be reunited with Dawn.[34] In August 2009 Elise contacted OCS to report that her son had moved out; she confirmed that she still sought foster placement.[35]

In October 2009 OCS placed Dawn with non-Native foster parents Kim and Harry Smith in Anchorage, and in December 2009 Elise visited Dawn.[36] Following this

---

[30](...continued)
> intervention. A party shall make its initial disclosures based on the information then reasonably available to it and is not excused from making its disclosures because it has not fully completed its investigation of the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

[31]   *Tununak I*, 303 P.3d at 433.

[32]   *Id*. at 433-34.

[33]   *Id*. at 434.

[34]   *Id*.

[35]   *Id*.

[36]   *Id*.

meeting, Elise did not call, write, or communicate with Dawn.[37] Also in December 2009 a representative from the Association of Village Council Presidents visited Elise's home in Tununak on OCS's behalf and noted potential hazards in the home that needed to be addressed before placement could occur.[38] These included unsecured guns, cleaning supplies, medicine, and general clutter in the area that Elise planned to use as Dawn's bedroom.[39] In February 2010 Elise assured OCS she would remedy these issues, and OCS asked Elise to arrange for a second home visit once she made the proposed changes.[40]

In May 2010 Elise attended a visit with Jenn and Dawn and told an OCS social worker that she thought Jenn would complete substance abuse treatment; Elise did not seek foster placement at that time and had not remedied the issues in her home.[41] OCS filed two petitions to terminate Jenn's parental rights: the first was denied in November 2010, and a second was filed in April 2011.[42] At a status conference in February 2011 Elise was present telephonically, and she questioned the court about whether Dawn would be returned to Jenn.[43] The court advised her in no uncertain terms that it was not safe for Dawn to return to Jenn's household given Jenn's continuing

---

[37]    *Id*.

[38]    *Id*.

[39]    *Id*.

[40]    *Id*.

[41]    *Id*.

[42]    *Id*. at 434-35.

[43]    *Id*. at 435.

mental health issues and illegal drug use.[44] The superior court ultimately terminated Jenn's parental rights in September 2011.[45] Following termination the Tribe argued there was no longer good cause to deviate from ICWA's placement preferences, and a placement hearing was scheduled.[46]

The Smiths filed an adoption petition on November 3, 2011, and the petition was stayed pending the resolution of the ICWA placement hearing on November 14, 2011.[47]

## B. Proceedings

### 1. The placement hearing and appeal

The superior court noted at the outset of the placement hearing that it would not consolidate the CINA placement case with the adoption case, but cautioned the Tribe that it would not get "two bites at the apple"; in other words, "if the Tribe los[t], it [would]n't get to contest placement in the adoption proceeding."[48] We explained in *Tununak I* that "[w]hen the court declined to consolidate the two cases, it stated that the future adoption proceeding would be dependent on the placement ruling in the CINA case"[49] and that "denying the Tribe's objections to adoptive placement [effectively] . . . clear[ed] the way for the Smiths to adopt Dawn."[50]

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 443.

[49] *Id.*

[50] *Id.* at 444.

Elise testified at the hearing.[51]  She had previously been an ICWA social worker and was aware of her ICWA rights.[52]  When asked if she wanted to take care of Dawn just because the Tribe wanted her to she answered with an equivocal "[y]es and no."[53]  She clarified:  "[I]t is my right to adopt or take my granddaughter and . . . raise her as an Alaska Native . . . because she is part of my flesh and blood and so that she [can] learn her values in Native culture and traditions and where she came from."[54]  Elise also said that she had not been able to see Dawn very often due to the expense of travel; she did not call or write letters to Dawn because the child was too young to read or communicate; she knew Dawn did not know her at that point; and she understood Dawn would have to be gradually introduced to life in the village to prevent culture shock.[55]  Elise testified that she wanted Dawn to be placed with her "from the beginning" and she recognized that "if [Dawn] had moved [in] with me when [Dawn] was [a] young infant, then it could have been easier because [Dawn] would have known [her] grandmother[,]" but at this point Dawn had been "raised by [Kim and Harry Smith]."  Elise also indicated at this hearing that she had filed a petition to adopt Dawn, but the record contains no evidence that such a petition was ever filed, and no party has argued to the contrary.[56]

In its decision on placement the superior court noted that Elise was 67 years old and would be 82 when Dawn turned 18.[57]  The court found Elise's testimony on the

---

[51]    *Id*. at 437-38.

[52]    *Id*.

[53]    *Id*. at 438.

[54]    *Id*. (internal quotation marks omitted).

[55]    *Id*.

[56]    In its briefing to us the Tribe conceded that no court petition was filed.

[57]    *Id*. at 439.

question of whether she wanted to adopt Dawn "less than convincing" and pointed out that she had maintained almost no contact with Dawn and knew nothing of Dawn's life in Anchorage.[58] The court also found that Elise testified that she wanted to adopt Dawn because the Tribe wanted her to.[59] The court found that the Smiths had been "exceptional foster parents" to Dawn.[60] Ultimately, the court determined there was good cause to deviate from ICWA's placement preferences by a preponderance of the evidence in accordance with Alaska Adoption Rule 11(f).[61] The Tribe moved to stay the Smiths' adoption proceeding pending the Tribe's appeal of the placement ruling to our court, but this motion was denied.[62]

### 2. The adoption hearing and appeal

On March 6, 2012, the superior court held an adoption hearing and granted the Smiths' adoption petition.[63] At that hearing the court noted that, since the placement hearing, "[n]o individual has come forward" and "[n]o names have been put forward of somebody who would be ICWA compliant under 1915(a) and the [Smiths] have been there for Dawn for . . . these several years and the child's almost four." The court concluded it was in Dawn's best interest to be adopted that day by the Smiths, but cautioned that "the adoption [could] be reversed . . . anything could happen including removal of the child" from the Smiths' care. Elise did not appear at the adoption hearing.

---

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* at 439-40.

[62] *Id.* at 440.

[63] *Id.*

The Tribe appealed the adoption to our court. On November 29, 2012, we issued an order sua sponte staying the adoption appeal pending our decision in the related adoption placement appeal.[64]

### 3. Our decision in the placement appeal in *Tununak I* and the United States Supreme Court's decision in *Baby Girl*

We issued our decision in the placement appeal on June 21, 2013.[65] In that opinion we reversed and remanded the superior court's adoptive placement decision.[66] We concluded that ICWA requires a heightened clear and convincing evidence standard of proof be applied to the § 1915(a) good cause determination.[67] Because the superior court's placement decision was decided under a preponderance of the evidence standard, we remanded for the superior court to undertake a new good cause determination, consistent with a clear and convincing evidence standard, to decide whether deviation from the preferred placement preferences provided in ICWA § 1915(a) was appropriate.[68] We issued an order along with our decision in *Tununak I* that requested the parties to brief their positions on whether our stay of Dawn's adoption appeal should continue pending the superior court's proceedings on remand following *Tununak I*.[69]

The United States Supreme Court issued its decision in *Adoptive Couple v. Baby Girl* four days later; the Court held that ICWA "§ 1915(a)'s preferences are

---

[64]    *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012).

[65]    *Tununak I*, 303 P.3d at 431.

[66]    *Id*. at 453.

[67]    *Id*.

[68]    *Id*. at 452-53.

[69]    *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, June 21, 2013).

inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[70]

In *Baby Girl*, the child's biological father (Biological Father) and biological mother (Birth Mother) broke off their engagement after Birth Mother became pregnant but would not accommodate Biological Father's request to move up the wedding.[71] Biological Father had no meaningful contact with Birth Mother following the couple's separation and sent her a text message indicating that he wished to relinquish his parental rights.[72] Birth Mother decided to give the child up for adoption and selected a non-Native adoptive couple (Adoptive Couple) through a private adoption agency.[73]

Approximately four months after Baby Girl's birth, Adoptive Couple served Biological Father with notice of their pending adoption petition.[74] Biological Father signed the paperwork, stating he was not contesting the adoption.[75] He later testified that he assumed he was relinquishing parental rights to Birth Mother.[76] Biological Father contacted a lawyer a day after signing the papers and subsequently requested a stay of the adoption proceedings.[77] In those proceedings he sought custody of Baby Girl, took a paternity test, and participated in a four-day trial after which the

---

[70]    *Baby Girl*, 133 S. Ct. 2552, 2564 (2013).

[71]    *Id*. at 2558.

[72]    *Id*.

[73]    *Id*.

[74]    *Id*.

[75]    *Id*.

[76]    *Id*.

[77]    *Id*. at 2558-59.

South Carolina Family Court ultimately awarded him custody and denied Adoptive Couple's adoption petition.[78]

That decision was appealed to the South Carolina Supreme Court, and Biological Father participated in that appeal.[79] The South Carolina Supreme Court characterized his appeal as a "legal campaign to obtain custody" and affirmed the family court order.[80] The decision was appealed to the United States Supreme Court, and Biological Father again participated in that appeal.[81] At no point did Biological Father file a petition to adopt Baby Girl.[82]

The United States Supreme Court ultimately reversed the South Carolina Supreme Court, holding in part that ICWA "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child."[83] The Court reasoned: "This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[84]

Because the Supreme Court's interpretation of ICWA § 1915(a) in *Baby Girl* called into doubt the application of § 1915(a)'s placement preferences on remand in *Tununak I* — as no one but the Smiths sought to formally adopt Dawn — we issued

---

[78]     *Id*. at 2559; *Adoptive Couple v. Baby Girl*, 731 S.E.2d 550, 555-56 (S.C. 2012) (*Adoptive Couple*) (indicating that the trial took place from September 12-15, 2011, when Baby Girl was roughly two years old), *reh'g denied*, (Aug. 22, 2012), *cert. granted*, 133 S. Ct. 831 (2013), and *rev'd*, 133 S. Ct. 2552 (2013).

[79]     *Adoptive Couple*, 731 S.E.2d at 552.

[80]     *Id*. at 552, 561.

[81]     *Baby Girl*, 133 S. Ct. at 2556.

[82]     *Id*. at 2564.

[83]     *Id*.

[84]     *Id*.

an order directing the parties to brief the effect of *Baby Girl* on the present adoption appeal and granted oral argument in the matter.[85]

## III. STANDARD OF REVIEW

"[T]he [United States] Supreme Court's decisions on issues of federal law, including issues arising under the Federal Constitution, bind the state courts' consideration of those issues,"[86] and we review those issues de novo.[87] Pure questions of law, including issues of statutory interpretation, invoke our "duty to 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy' "[88] using our independent judgment.[89]

## IV. DISCUSSION

All parties agree that we must decide the Tribe's challenge on appeal to the Smiths' adoption of Dawn in light of the Supreme Court's decision in *Baby Girl*. The State contends that "[b]ecause no one other than the Smiths formally sought to adopt Dawn, her adoption should be upheld under the controlling [*Baby Girl*] decision." The Smiths agree. The Tribe urges us to vacate the superior court's adoption decree and remand this matter for an adoptive placement determination based on our decision in *Tununak I* that required the superior court to find, under a clear and convincing evidence standard, whether there is good cause to deviate from ICWA § 1915(a)'s placement

---

[85]    *Native Vill. of Tununak v. State, OCS, et al.*, No. S-14670 (Alaska Supreme Court Order, Oct. 7, 2013).

[86]    *Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004).

[87]    *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Doherty*, 167 P.3d 64, 68-70 (Alaska 2007) (applying de novo review to § 1983 claims as a matter of federal law).

[88]    *West v. Buchanan*, 981 P.2d 1065, 1066 (Alaska 1999) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[89]    *Doe*, 92 P.3d at 402.

preferences. The Tribe takes the position that: (1) *Baby Girl* is factually distinguishable and inapplicable to state-driven child protection cases; (2) to the extent *Baby Girl* does apply, it merely requires that a specific family be formally identified as desiring placement of the Native child and Elise satisfied that requirement in this case; and (3) the requirement is satisfied in Alaska as soon as a tribe intervenes in the case and makes formal CINA Rule 8(c)(7) disclosures.

Finally, the Tribe contends that, if we interpret *Baby Girl* to mean that ICWA's placement preferences are inapplicable until an alternative adoptive family files a competing adoption petition, this decision will have disastrous results for rural Alaska, placing the largest burden on Native families with the fewest legal and financial resources, and create a dangerous disincentive for OCS, as the agency will place Native children in the first available home, thereby neutering the protections that ICWA originally sought to provide to promote the preservation of the Indian family.

The Tribe's interpretation of *Baby Girl*, as echoed by the dissent, strains the plain wording of a clear, unequivocal, and unqualified decision on a matter of federal law as interpreted by the United States Supreme Court. For the reasons that follow, we conclude that we are required to apply the Supreme Court's bright-line interpretation of ICWA § 1915(a)'s placement preferences to bar from consideration as an adoptive placement an individual who has taken no formal step to adopt the child.

## A. ICWA § 1915(a) and *Baby Girl* Do Not Distinguish A State-Initiated Child Custody Proceeding From A Voluntary Private Adoption.

ICWA § 1915(a)'s placement preferences apply to "*any* adoptive placement of an Indian child under State law,"[90] and ICWA defines adoptive placements broadly as "the permanent placement of an Indian child for adoption, including *any action*

---

[90] 25 U.S.C. § 1915(a) (emphasis added).

resulting in a final decree of adoption."[91]   The federal statute does not distinguish between state-initiated child protection cases and voluntary adoptions.  The Supreme Court in *Baby Girl* also did not carve out such a distinction.  In *Baby Girl*, the Supreme Court held without qualification that § 1915(a), "which provides placement preferences for the adoption of Indian children, does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child."[92]   The Court emphasized that the "scope" of § 1915(a) has a "critical limitation," namely, that "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child."[93]   The Court reiterated, "This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[94]   To make its rationale perfectly clear, the Court again explained that, because Adoptive Couple was the only family that "sought to adopt Baby Girl," § 1915(a)'s "rebuttable adoption preferences [did not] apply [because] no alternative party . . . formally sought to adopt the child."[95]   As a policy matter, the Court broadly concluded that while ICWA "was enacted to help preserve the cultural identity and heritage of Indian tribes," to require a placement preference determination for a party who did not seek to adopt "would put certain vulnerable children at a great disadvantage solely because an ancestor — even a remote one — was an Indian."[96]   The Court cautioned that such a result may cause "prospective

---

[91]   25 U.S.C. § 1903(l)(iv) (emphasis added).

[92]   *Baby Girl*, 133 S. Ct. 2552, 2557 (2013).

[93]   *Id*. at 2564.

[94]   *Id*.

[95]   *Id*. at 2565.

[96]   *Id*.

adoptive parents [to] . . . pause before adopting any child who might possibly qualify as an Indian under the ICWA."[97]

The dissent characterizes these statements by the United States Supreme Court interpreting § 1915(a) as dicta addressing the South Carolina Supreme Court's suggestion that if it had terminated Biological Father's rights, § 1915(a)'s preferences would have applied. But *Baby Girl* explained, clarified, and decided that § 1915(a) did *not* apply where no alternative party sought to adopt the Indian child, as was the case of Biological Father. When discussing the distinction between a holding and dictum, the Supreme Court has directed that "[w]hen an opinion issues for the Court, it is not only the result[,] but also those portions of the opinion necessary to that result by which we are bound."[98] We are likewise bound by the Supreme Court's holding concerning § 1915(a); it was necessary to the Supreme Court's reversal of the judgment of the South Carolina Supreme Court and its remand of the case for further proceedings.[99] In those

---

[97] *Id*.

[98] *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

[99] *See Baby Girl*, 133 S. Ct. at 2564-65. The dissent points out that *Baby Girl* did not consistently use the word "hold" in its summary of the three central holdings in the case; instead, the Court stated:

> [W]e *hold* that 25 U.S.C. § 1912(f) . . . does not apply when, as here, the relevant parent never had custody of the child. We further *hold* that § 1912(d) . . . is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child. Finally, we *clarify* that §1915(a) . . . does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child. We accordingly reverse the South Carolina Supreme Court's judgment and remand for further proceedings.

*Id*. at 2557 (emphasis added). Contrary to the dissent's argument, we do not agree that

(continued...)

(...continued)
the Court's use of the word "clarify" as opposed to "hold" when addressing §1915(a) "leaves room for states to determine under their own adoption procedures when an eligible candidate has come forward such that the preferences should be applied."  Our cases often use the word "clarify" to signal a holding.  For example, in *Bruce L. v. W.E.*, 247 P.3d 966, 976 (Alaska 2011), we stated:

> At first blush *A.B.M.* seems to mandate a reversal of the trial court's determination that Timothy is not an Indian child because the Eberts' concessions to the contrary throughout the proceedings should constitute judicial admissions.  But given our subsequent case law defining the limitation of judicial admissions to purely factual matters and our discussion here regarding the nature of membership or eligibility for membership in a tribe, we *clarify* that the holding of *A.B.M.* is limited to precluding the adoptive parents from arguing a new position on appeal contrary to a position they had taken in the superior court on an issue not raised to or decided by that court.

(emphasis added) (footnote omitted).  *See also Griswold v. City of Homer*, 252 P.3d 1020, 1027 (Alaska 2011) ("We therefore *clarify* that where the superior court acts as an intermediate appellate court . . . its opinion or decision on appeal is the 'judgment' to which [the applicable appellate rule] refers." (emphasis added)); *Husseini v. Husseini*, 230 P.3d 682, 688 (Alaska 2010) ("We take this opportunity to elaborate on our holding in [a prior case] . . . . [W]e *clarify* that the trial court's decision to order the sale of a marital asset prior to the final property decision must be accompanied by factual findings that demonstrate the exceptional circumstances justifying such a sale and that specifically articulate the grounds upon which the order for sale is based." (emphasis added)); *Keane v. Local Boundary Comm'n*, 893 P.2d 1239, 1249-50 (Alaska 1995) ("[W]e *clarify* that the test presented in [our prior case], is still applicable . . . [and] 'a different rule applies where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury.' " (emphasis added) (citation omitted)).

We conclude that the dissent's "reliance on words, phrases, and quotations" over substantive legal conclusions in this case confuses dicta from the Court's actual holding.  Judith M. Stinson, *Why Dicta Becomes Holding and Why It Matters*, 76 BROOK. L. REV. 219, 222 (2010).  The Supreme Court, as the ultimate arbiter of federal

(continued...)

further proceedings, it was clear to the South Carolina Supreme Court that § 1915(a)'s rebuttable adoption preferences did not apply to Biological Father, and the South Carolina court did not apply them.  As the South Carolina Supreme Court stated on remand:

> *The* [*United States*] *Supreme Court has articulated the federal standard*, and its application to this case is clear: . . . ICWA does not authorize [Biological] Father's retention of custody.  Therefore, we reject [Biological] Father's argument that 1915(a)'s placement preferences could be an alternative basis for denying the Adoptive Couple's adoption petition.  The Supreme Court majority opinion *unequivocally states*[] [that] "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child." . . . .  As the opinion suggests, at the time Adoptive Couple sought to institute adoption proceedings, they were the only party interested in adopting [Baby Girl].  *Because no other party has sought adoptive placement in this action, § 1915 has no application in concluding this matter . . . .*[100]

The Supreme Court's federal standard is now clear, and consequently § 1915(a)'s preferences will not apply in this case.

The dissent asserts that *Baby Girl* is factually distinguishable because "[r]ather than a termination of parental rights through a private adoption arranged by a non-Indian parent after an Indian parent abandoned the child, this was a state-sponsored parental rights termination and a state-sponsored adoptive placement clearly subject to

_____

**99**(...continued)
law, has counseled that "unless we wish anarchy to prevail within the . . . judicial system, a precedent of this Court must be followed by the lower . . . courts [on issues of federal law] no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982).  *Baby Girl* compels today's result.

**100**     *Adoptive Couple v. Baby Girl*, 746 S.E.2d 51, 52-53 (S.C. 2013) (footnote and citation omitted) (emphasis added), *petitions for reh'g denied*, 746 S.E.2d 346 (S.C. 2013), *stay denied*, 134 S. Ct. 32 (2013).

ICWA." The Supreme Court previously has explicitly discussed distinctions between voluntary and non-voluntary relinquishments of parental rights in the context of ICWA; it did not do so in *Baby Girl*. In *Mississippi Band of Choctaw Indians v. Holyfield* (*Holyfield*), the Court noted that while the focus of Congressional testimony on ICWA was "on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves [from] the massive removal of their children"[101] outside of this context.[102] The *Holyfield* decision involved the voluntary adoption of twin babies.[103] The Court concluded that ICWA still applied to such a situation because "[t]ribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe,"[104] and congressional intent clearly indicated that an

---

[101]    490 U.S. 30, 34 (1989).

[102]    *Id*. at 49-51 (discussing how Congress subjects non-Indian family placements of young Indian children to ICWA's "jurisdictional and other provisions, *even in cases where the parents consented to an adoption*, because of concerns going beyond the wishes of individual parents" (emphasis added)).

[103]    *Id*. at 37. In *Holyfield* a petition for adoption was filed for twin babies whose parents were enrolled members of the Mississippi Band of Choctaw Indians and residents and domiciliaries of the tribal reservation in Mississippi. *Id*. The twins were born 200 miles from the reservation, and the parents executed consent-to-adoption forms leading to the adoption of the children by non-Indian adoptive parents. *Id*. at 37-38. The tribe moved to vacate and set aside the decree of adoption. *Id*. at 38. The Supreme Court held the children were "domiciled" on the reservation within the meaning of ICWA's exclusive tribal jurisdiction provision even though they were never physically present on the reservation themselves, and the trial court was without jurisdiction to enter the adoption decree even though the children were "voluntarily surrendered" for adoption. *Id*. at 48-51.

[104]    *Id*. at 49.

individual Indian could not defeat ICWA's jurisdictional scheme by voluntary action.[105]

In *Holyfield*, the Court adopted and applied its broad-sweeping interpretation of ICWA to all types of parental rights relinquishment cases, including those arising out of a parent's voluntary action. If in *Baby Girl* the Court had intended to limit its holding to voluntary adoptions, it certainly could have articulated such a restriction. But no such limiting language appears in the Court's opinion in *Baby Girl*. Because the Court did not limit its holding in *Baby Girl* to voluntary adoptions, we reject the Tribe's and the dissent's attempt to factually distinguish *Baby Girl* from the case before us where the adoption resulted from state-initiated child protective proceedings.

## B.     Elise Did Not Formally Seek To Adopt Dawn.

We are "not bound by decisions of federal courts other than the United States Supreme Court on questions of federal law."[106] But in cases where the Supreme Court has decided a question of federal law that is directly applicable to and binding on the case we are to decide, we "owe obedience to the decisions of the Supreme Court of the United States . . . and a judgment of the Supreme Court provides the rule to be followed . . . until the Supreme Court sees fit to reexamine it."[107]

After Dawn was placed in emergency foster care, the Tribe early on provided Elise's name to OCS as a potential placement option in its CINA Rule 8(c)(7) disclosures.[108] Elise discussed her initial interest in being a placement with OCS, but she

---

[105]     *Id*. at 51.

[106]     *Totemoff v. State*, 905 P.2d 954, 963 (Alaska 1995) (citing *In re F.P.*, 843 P.2d 1214, 1215 n.1 (Alaska 1992)).

[107]     *McCaffery v. Green*, 931 P.2d 407, 415 (Alaska 1997) (Rabinowitz, J., dissenting) (quoting 1B JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 0.402[1], at 1-10 (2d ed.1996)) (internal quotation marks omitted).

[108]     *Tununak I*, 303 P.3d 431, 433 (Alaska 2013).

was ruled out at that time because an adult son living with her had a barrier-crime.[109] Dawn was placed with non-Native foster parents in Anchorage so that she could be closer to her mother while Jenn completed treatment, and the parties stipulated that there was good cause to deviate from ICWA's placement preferences during this period while Jenn worked toward reunification with Dawn.[110] In August 2009 Elise contacted OCS to report that her son had moved out; she confirmed that she still sought placement, but in December 2009 a representative from the Association of Village Council Presidents visited Elise's home in Tununak on OCS's behalf and noted potential hazards in the home that needed to be addressed before placement could occur.[111] Elise assured OCS she would remedy these issues.[112] During this period Jenn was working toward reunification with Dawn,[113] and Elise understandably wished to support her daughter in that endeavor.

The critical piece, however, is Elise's failure to formally assert her intent to adopt Dawn as OCS moved toward terminating Jenn's parental rights. The superior court denied OCS's first petition to terminate parental rights in November 2010, and a second petition was filed in April 2011 that ultimately resulted in termination in September 2011. At a status conference in February 2011 the superior court advised Elise that placement with Jenn was not a viable option due to Jenn's continued mental health and drug issues. And when the Smiths filed a formal petition to adopt Dawn on November 3, 2011, Elise did not file a competing adoption petition or any other formal

---

[109]    *Id*. at 433-34.

[110]    *Id*. at 434.

[111]    *Id*.

[112]    *Id*.

[113]    *Id*.

request that might serve as a proxy for such a petition.[114]  In other words, knowing that the Smiths had the only legally viable request for adoption before the court at that time, Elise did not file a competing request to be considered an adoptive parent for Dawn prior to the placement hearing.

Elise did appear at the November 14, 2011 placement hearing and testified that she wanted to adopt Dawn.[115]  She also testified that she had filed a formal adoption petition herself in Bethel.  From the record developed by the parties both in the superior court and in this court, there is no indication that Elise filed an adoption petition or otherwise filed *any* formal court document demonstrating her intent to adopt Dawn.  In its briefing to us the Tribe conceded that no court petition was filed.  The superior court found Elise's testimony on her desire to adopt "less than convincing," observing that Elise also said that she wanted to adopt Dawn because the Tribe wanted her to and pointing out that she had maintained almost no contact with Dawn and knew nothing of Dawn's life in Anchorage.  The superior court made this credibility determination and our role as the reviewing court is not to reweigh the evidence on this point, but instead to "review a trial court's decision in light of the evidence presented to that court."[116]

In *Baby Girl*, Biological Father displayed a much higher level of involvement, but the Supreme Court nonetheless found his efforts insufficient.  Biological Father requested a stay of the adoption proceedings after learning of Adoptive Couple's pending request and sought custody of Baby Girl.[117]  He participated in a trial

---

[114]    *See id.* at 435.

[115]    *Id.* at 435, 437-38.

[116]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013).

[117]    *Baby Girl*, 133 S. Ct. 2552, 2558-59 (2013).

in the South Carolina Family Court and was awarded custody,[118] had that custody order affirmed by the South Carolina Supreme Court,[119] and participated in the appeal before the United States Supreme Court. Notwithstanding this active participation by Biological Father at every level of the state and federal litigation, the Supreme Court still found that "he did not seek to *adopt* Baby Girl; instead, he argued that his parental rights should not be terminated in the first place."[120] In other words, because Biological Father did not "formally [seek] to adopt" Baby Girl, the Supreme Court held that he could not be an ICWA preferred placement — he was not an "alternative party" that triggered § 1915(a)'s adoptive preferences.[121]

Applying the Supreme Court's controlling precedent to the facts before us, it is clear that this is also a case where "there simply is no 'preference' to apply [as] no alternative party that is eligible to be preferred under § 1915(a) has come forward"[122] to adopt Dawn. Because the Smiths were the only family that, in the words of the Supreme Court, "formally sought to adopt" Dawn, § 1915(a)'s "rebuttable adoption preferences [do not] apply [because] no alternative party has formally sought to adopt [this] child."[123] In short, we are bound by *Baby Girl*'s interpretation of this subsection of ICWA, and cannot ignore the Supreme Court's clear, unqualified ruling on a matter of federal Indian law.

---

[118]    *Id*. at 2559.

[119]    *Id*.

[120]    *Id*. at 2564 (emphasis in original).

[121]    *Id*. at 2565 ("Nor do § 1915(a)'s rebuttable adoption preferences apply when no alternative party has formally sought to adopt the child.").

[122]    *Id.* at 2564.

[123]    *Id*. at 2565.

**C. Alaska CINA Rule 8(c)(7) Disclosures Are Not Analogous To Requiring An Individual To Formally Seek To Adopt A Child.**

We are likewise not persuaded by the Tribe's argument that Elise's contact information on the Tribe's CINA Rule 8(c)(7) disclosure in the underlying CINA case amounts to a formal adoption request. Rule 8(c)(7) directs that a tribe shall "without awaiting a discovery request, provide to other parties . . . names and contact information for extended family of the child, a list of potential placements under . . . § 1915, and a summary of any tribal services or tribal court actions involving the family." These initial disclosures must be made within 45 days of the order granting intervention.[124]

A tribe's production of contact information for possible placements is neither equivalent nor analogous to a formal adoption petition. Rule 8(c)(7) is a discovery procedure; it requires disclosure of potential placement options for OCS to consider. A Rule 8(c)(7) disclosure was filed by the Tribe; it does not in any way represent a clear expression by Elise (or anyone else) of a formal intent to adopt the child. An adoption petition, on the other hand, is the legally "formal" way for a person to express a readiness and willingness to adopt a child. In *Baby Girl*, the Supreme Court envisioned a bright-line test: in order to qualify for ICWA § 1915(a)'s adoptive placement preference, one must first "formally seek" to adopt the child by filing a petition for adoption.[125] If Biological Father did not meet this bright-line standard, notwithstanding his significant involvement at every level of the *Baby Girl* case, the Tribe's tender of Elise's contact information shortly after the Tribe's intervention in this case cannot meet the standard of "formally seeking" to adopt.

---

[124] CINA Rule 8(c)(7).

[125] *Baby Girl*, 133 S. Ct. at 2564.

## D.    The Tribe's Policy Considerations

Finally, the Tribe argues that if we interpret *Baby Girl* to hold that ICWA's placement preferences are inapplicable until an alternative Native adoptive family member files a competing adoption petition, this decision will place a difficult burden on Native families, which have the fewest legal and financial resources, and create a dangerous incentive for OCS to place Native children in the first available home "except in the rare case when a Native family files its own adoption petition." The dissent echoes the Tribe's concerns, noting that "at least one state practice guide" does not read *Baby Girl* to mean an adoption petition must be filed; rather, all the practice guide cautions is that the adoptive candidate "formally" assert his or her intent to adopt the child and take "proper steps" to convey these intentions to the court.[126]

But the dissent misses the point of the practice guide. The practice guide concludes that "[f]or practitioners representing a parent of an Indian child who wants assurances that his or her child will be placed with another family or tribal member if adoption is needed, the lesson is clear: identify early on any family members, relatives, or tribal members who are willing and desirous of custody and take *proper steps* to *formally* convey their intentions to the court in this regard."[127] As we have explained, we read *Baby Girl* to mean that filing a petition for adoption *is* "formally" asserting an intent to adopt using the "proper steps." And while we do not disregard the Tribe's policy concerns, neither may we disregard the holding of the Supreme Court on this matter of federal law.

Having said this, we urge tribes and OCS to enable and assist tribal members to seek placement early in CINA and voluntary adoption cases, accompanied

---

[126]    *See* CHRISTINE P. COSTANTAKOS, JUVENILE COURT LAW & PRACTICE § 13:12 (2013).

[127]    *Id*. (emphasis added).

by a formal adoption petition once it appears that OCS's goal for the child is adoption. The Alaska Court System, attorneys representing tribes in Alaska, the CINA bar, the probate bar, and others will work to develop appropriate adoption forms and online information and instructions to assist tribes and potential adoptive parents in navigating this requirement.

We also stress that OCS remains bound to comply with § 1915(a)'s adoptive placement preferences for "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." And our decision in *Tununak I* directs that "OCS must prove by clear and convincing evidence that there is good cause to deviate from ICWA § 1915(a)'s adoptive placement preferences."[128] Implicit in this holding is the understanding that *before* the court entertains argument that there is good cause to deviate from § 1915(a)'s preferred placements, it must searchingly inquire about the existence of, and OCS's efforts to comply with achieving, suitable § 1915(a) preferred placements. Contrary to the dissent's suggestion, today's decision has no bearing on OCS's duty to comply with the express purpose of ICWA "to promote the stability and security of Indian tribes and families."[129] We anticipate that our decisions in *Tununak I* and today will highlight the importance of OCS identifying early in a CINA case all potential preferred adoptive placements, and the importance of a person claiming preferred placement filing a petition for adoption, in order to effectuate Congress's intent "to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society."[130]

---

[128]  *Tununak I*, 303 P.3d 431, 450 (Alaska 2013).

[129]  *D.J. v. P.C.*, 36 P.3d 663, 677 (Alaska 2001) (internal quotation marks omitted) (citing 25 U.S.C. § 1902).

[130]  *Tununak I*, 303 P.3d at 441-42 (citing *Miss. Band of Choctaw Indians v.*
(continued...)

## V.   CONCLUSION

Because we are bound to follow the United State Supreme Court's decision in *Baby Girl*, and because no one but the Smiths formally sought to adopt Dawn, we AFFIRM the superior court's grant of the adoption and VACATE *Tununak I*'s prior order for a renewed good cause hearing in the underlying placement matter. The remainder of our opinion in *Tununak I* is unaffected by our decision today.

---

[130](...continued)
*Holyfield*, 490 U.S. 30, 37 (1989)).

Additionally, as the dissent acknowledges, § 1915(e) requires OCS to document its "efforts to comply with the order of preference specified in [§ 1915(a)]" when such a placement is made following a properly filed petition. We expect that the superior court will carefully and actively scrutinize OCS's efforts in identifying potential adoptive placements and complying with its obligations under § 1915(a) and our case law.

WINFREE, Justice, dissenting.

I respectfully disagree with today's decision. In my view the court overstates the United States Supreme Court's holding in *Adoptive Couple v. Baby Girl* (*Baby Girl*)[1] and understates the nature of the underlying adoptive placement proceeding in this case, discussed at some length in *Native Village of Tununak v. State, Department of Health & Social Services, Office of Children's Services* (*Tununak I*).[2]

*Baby Girl* arose from a state court private adoption proceeding where: (1) the Indian father abandoned the child before birth; (2) the non-Indian mother found an appropriate couple willing to adopt the child; and (3) the state's statutes provided that under these circumstances the father's parental rights could be terminated and the adoption completed.[3] But the father contested the termination of his parental rights and the adoption, arguing that because the child was an Indian child under the Indian Child Welfare Act (ICWA),[4] he was entitled to ICWA's protections against the termination of his parental rights.[5]

Because the case involved only the termination of the father's parental rights, the focus of the Supreme Court's decision was on ICWA §§ 1912(d) and (f), neither of which is at issue in this case. The Court first addressed § 1912(f), noting that it

> provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that

---

[1]     133 S. Ct. 2552 (2013).

[2]     303 P.3d 431 (Alaska 2013).

[3]     133 S. Ct. at 2558-59; *Adoptive Couple v. Baby Girl* (*Adoptive Couple*), 731 S.E.2d 550, 553-56, 561 (S.C. 2012), *rev'd*, 133 S. Ct. 2552.

[4]     25 U.S.C. §§ 1901-1963 (2012).

[5]     *Baby Girl*, 133 S. Ct. at 2559; *Adoptive Couple*, 731 S.E.2d at 555-56.

the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[6]

The Court held that § 1912(f) was inapplicable because the father never had legal or physical custody of the child,[7] and noted that ICWA's protections were not applicable: "In sum, when, as here, the adoption of an Indian child is voluntarily and lawfully initiated by a non-Indian parent with sole custodial rights, the ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated."[8]

The Court next addressed § 1912(d), noting it "provides that '[a]ny party' seeking to terminate parental rights to an Indian child under state law 'shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed *to prevent the breakup of the Indian family* and that these efforts have proved unsuccessful.' "[9]  The Court held that §1912(d) was inapplicable because the father had abandoned the child and there was no family unit to protect:

> [W]e hold that § 1912(d) applies only in cases where an Indian family's breakup would be precipitated by the termination of the parent's rights. The term breakup refers in this context to the discontinuance of a relationship, or an ending as an effective entity. But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no relationship that would be discontinued — and no effective entity that would be ended — by the termination of the Indian parent's rights. In such a situation, the breakup of

---

[6]     *Baby Girl*, 133 S. Ct. at 2560 (alteration and emphasis in original).

[7]     *Id.* at 2562.

[8]     *Id.* at 2561.

[9]     *Id.* at 2562 (alteration and emphasis in original).

the Indian family has long since occurred, and § 1912(d) is inapplicable.[10]

The Court then addressed the state court's dicta — that even if the father's parental rights were properly terminated, § 1915(a)'s adoptive placement preferences still would apply — with its own dicta:[11]

> In the decision below, the [state court] suggested that if it had terminated Biological Father's rights, then § 1915(a)'s preferences for the adoptive placement of an Indian child would have been applicable. . . .
>
> Section 1915(a) provides that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." [But] § 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no "preference" to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward.[12]

The Court noted that the father had been contesting the termination of his parental rights rather than seeking to adopt the child, that the paternal grandparents had not sought custody of the child, and that the tribe had not presented any tribal member seeking to adopt the child.[13] Thus, no one with a § 1915(a) preference had "come forward" to adopt the child.[14]

---

[10]    *Id.* (alterations, citations, and internal quotation marks omitted).

[11]    *See id.* at 2557 (stating §§ 1912(f) and (d) rulings were holdings, but stating § 1915(a) discussion was clarification to state court).

[12]    *Id.* at 2564 (citation omitted).

[13]    *Id.*

[14]    *Id.*

From this, today the court interprets the Supreme Court as requiring that "with respect to adoptive placements for an Indian child *under state law*,"[15] a formal state court adoption petition, or a formal "proxy," must be filed before a person will be considered for adoptive placement preference under § 1915(a).[16] But in my view: (1) the Supreme Court imposed no such requirement, which would impliedly preempt state adoption procedures;[17] (2) as this case amply demonstrates, such a requirement elevates form over substance; and (3) such a requirement in the context of this case flies in the face of ICWA's express purpose.

---

[15]     *Id.* at 2558 (emphasis added).

[16]     It is undisputed that in this case the grandmother did not file a state court adoption petition. The court notes the grandmother's testimony that she had petitioned for placement and adoption, and then notes there is no such petition in the state court. But the grandmother was not asked whether she was referring to paperwork filed in state court or tribal court, or even whether it was paperwork given to the Office of Children's Services. When the grandmother testified during the adoption placement hearing, the adoption petition question was a side-issue directed to whether she truly wanted to adopt. Because the record for this appeal was created well before a formal adoption petition requirement became an issue, the record before us does not reveal to what the grandmother was referring in her testimony; it may be the "proxy" for a state court adoption petition that the court says is missing in this case.

[17]     *Cf. In re Brandon M.*, 63 Cal. Rptr. 2d 671, 677-78 (Cal. App. 1997) ("Congress clearly intended that [ICWA] exist side-by-side with the child custody laws of the 50 states and necessarily understood that the courts of those states would and should attempt to harmonize, not presume conflicts between, the two."); *In re Adoption of A.B.*, 245 P.3d 711, 719 (Utah 2010) ("So long as [ICWA's] core protections are honored and the intent of ICWA is preserved, states may fashion the underlying procedural framework.").

The Supreme Court made no holding about § 1915(a),[18] but observed that § 1915(a) does not apply when no eligible person "has formally sought to adopt the child . . . because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[19] The Court's initial overview of its decision stated it was clarifying that § 1915(a) preferences are inapplicable if no eligible candidates "have sought to adopt the child," without using the word "formally."[20] The Court did not hold that whether an eligible candidate has come forward is a matter of federal law. And it certainly did not hold as a matter of federal law that § 1915(a) can apply only when an eligible person has filed an adoption petition in state court.[21]

---

[18] The court today asserts that I am mistaken on this point, concluding that the Supreme Court's decision about § 1915(a) constitutes a "holding." I prefer to rely on the Supreme Court's own statements about its decision:

> [W]e *hold* that 25 U.S.C. § 1912(f) . . . does not apply when, as here, the relevant parent never had custody of the child. We further *hold* that § 1912(d) . . . is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child. Finally, we *clarify* that § 1915(a) . . . does not bar a non-Indian family . . . from adopting an Indian child when no other eligible candidates have sought to adopt the child.

*Baby Girl*, 133 S. Ct. at 2557 (emphasis added). I might agree with the court's conclusion had *Baby Girl* actually involved the application of § 1915(a)'s adoption placement preferences, even in part. But it did not — the questions actually presented and decided were whether §§ 1915(d) and (f) applied to the statutory parental rights termination in the state court. I do not reject the notion that clarification of a holding can itself be a holding; that is not the case here.

[19] *Id.* at 2564.

[20] *Id.* at 2557.

[21] *Cf. id.*

Yet today the court asserts that state courts are constrained by the Supreme Court's decision and now can apply § 1915(a) preferences only when competing state court adoption petitions exist. It is not at all self-evident that this is what the Supreme Court meant,[22] and it is even less self-evident that the Supreme Court impliedly created a monolithic federal rule trumping state court adoption procedures. The Court's clarification certainly leaves room for states to determine under their own adoption procedures when an eligible candidate has come forward such that the preferences should be applied.[23] *Baby Girl* does not compel today's result; today's result comes directly

---

[22] At least one state practice guide does not read *Baby Girl* to mean an adoption petition must be filed. In Nebraska, the Juvenile Court Law and Practice guide cautions practitioners that *Baby Girl* "eliminates the need for a party to demonstrate good cause to depart from the ICWA adoptive-placement preferences, where no one described in those statutorily-designated preferences has stepped forward to *formally assert an intent* to acquire custody of, or to adopt the child." CHRISTINE P. COSTANTAKOS, JUVENILE COURT LAW & PRACTICE § 13:12 (2013) (emphasis added). The practice guide merely directs that, "[f]or practitioners representing a parent of an Indian child who wants assurance that his or her child will be placed with another family or tribal member if adoption is needed, the lesson is clear: identify early on any family members, relatives, or tribal members who are willing and desirous of custody *and take proper steps to formally convey their intentions to the court* in this regard." *Id.* (emphasis added). This approach makes abundant sense to me.

[23] *Cf. Baby Girl*, 133 S. Ct. at 2558 (noting that the § 1915(a) preferences apply "with respect to adoptive placements for an Indian child *under state law*" (emphasis added)); *In re Adoption of A.B.*, 245 P.3d 711, 719 (Utah 2010) (noting "states may fashion the underlying procedural framework" for applying ICWA's substantive standards); *State ex rel. C.D.*, 200 P.3d 194, 209 (Utah App. 2008) (noting "there are no express statutory provisions declaring [the procedure for] compl[ying] with the ICWA's placement preferences").

In fact, on remand of *Baby Girl*, the state court applied its own adoption law in determining whether newly filed competing adoption petitions in the case were eligible for § 1915(a) preferences; the court held the petitions were ineligible because the "litigation must have finality, and it is the role of this court to ensure 'the sanctity of the adoption process' *under state law* is 'jealously guarded.' " *Adoptive Couple v. Baby Girl*

(continued...)

from this court and imposes a new state-law barrier to § 1915(a)'s adoption placement preferences.[24]

It is self-evident that if no one eligible and suitable for a § 1915(a) adoptive placement preference comes forward to adopt an Indian child, there can be no preferred adoptive placement.[25] This is not a particularly novel understanding; it was precisely the

---

[23](...continued)
(*Adoptive Couple II*), 746 S.E.2d 51, 53 (S.C. 2013) (emphasis added) (quoting *Gardner v. Baby Edward*, 342 S.E.2d 601, 603 (S.C. 1986)).

[24]     *Cf. Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36-37 (1989) (stating placement preferences are "[t]he most important substantive requirement imposed on state courts"); *Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 465 (Alaska 2012) ("We recognize that the placement preferences under section 1915 are critical to ICWA's goal of promoting the stability and security of Indian tribes and families."); *In re Adoption of Sara J.*, 123 P.3d 1017, 1024 (Alaska 2005) (stating § 1915(a) established federal policy that " 'where possible, an Indian child should remain in the Indian community' " (quoting H.R. Rep. No. 95-1386, at 23, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546)).

[25]     As we explained in *In re Adoption of Sara J.*:

> [A]lthough it is correct that the word "preference" generally connotes a choice between two options, we read ICWA's structure and purpose to preclude choosing between preferred and non-preferred placements if the preferred placement is "suitable," as measured by the prevailing social and cultural standards of the Indian community. The existence of a suitable preferred placement precludes *any* consideration of a non-preferred placement unless good cause exists, for example, because another preference has been expressed by the child or the child's biological parents, or because the child has special needs that cannot be met by an otherwise-suitable preferred placement.

123 P.3d at 1028 (emphasis in original) (citation omitted); *see also* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,594 (Nov. 26, 1979) (stating one good cause factor for deviation from § 1915(a) is "[t]he unavailability of

(continued...)

factual situation in *Baby Girl*, and the Supreme Court's language should not be read to suggest anything more. We described the eligibility-suitability determination process in *Tununak I*:

> [B]efore determining whether good cause exists to deviate from the placement preferences, a court must first inquire as to whether any suitable preferred placements exist.
>
> The "preferred placement" inquiry requires a court to apply the statutory framework and follow the tiered order of preference mandated by ICWA, i.e., give preference first to a member of the child's extended family, then to other members of the Indian child's tribe, and then to other Indian families. This does not end the inquiry, however, as the court must also assess the suitability of each prospective placement if a party alleges that a preferred placement is unsuitable. In other words, the court must determine not only that a placement is preferred, but also that the placement would be a suitable caretaker for the child.[26]

But after today's decision, it does not appear that a trial court has to make any inquiry about preferential adoptive placement unless an eligible person actually files an adoption petition.[27] And now, when multiple relatives in a village might consider

---

[25](...continued)
suitable families for placement after a diligent search has been completed for families meeting the preference criteria").

[26]    303 P.3d 431, 450 (Alaska 2013) (citations omitted).

[27]    *Cf.* CINA Rule 10.1(b) (requiring continuing court inquiry regarding compliance with § 1915(b)'s placement preferences prior to termination of parental rights). The CINA rules do not explicitly require such an inquiry for an adoptive placement.

One can only wonder about the impact of today's decision on the State's duties regarding § 1915(a)'s placement preferences. We have not had occasion to consider the exact contours of the State's duty to search for eligible preferred adoptive placements and assist such parties in coming forward. The Bureau of Indian Affairs Guidelines assume that a "diligent search" will be made for a preferred adoptive

(continued...)

adopting a child after a termination of parental rights, they cannot simply participate in adoptive placement proceedings in the child in need of aid case to determine who is eligible and suitable, but rather must file separate and competing formal adoption petitions.

The tribe makes a persuasive argument that requiring a state court adoption petition to trigger § 1915(a)'s adoptive placement preferences will have disastrous results for Alaska's rural Natives. In many villages the court system has no presence and legal representation is nonexistent. Village relatives who might seek to adopt have little way of knowing when a child has been freed for adoption in an urban child in need of aid court proceeding, or whether a non-Indian foster family has filed an adoption petition. In my view § 1915(a) placement preferences should, *at the very least*, apply when a person seeks adoptive placement in a child in need of aid proceeding. I see no good reason for requiring a state court adoption petition to trigger ICWA's preferences, and if seeking adoptive placement in a child in need of aid proceeding is not a "proxy" to such a petition, what is?

---

[27](...continued)
placement and that an unsuccessful search will be good cause to deviate from § 1915(a)'s mandated preference list. Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed. Reg. at 67,594. And § 1915(e) requires the State to document its "efforts to comply with the order of preference specified in [§ 1915]." I have previously expressed the view that the State has an affirmative duty to effectuate placement preferences when possible. *Josh L.*, 276 P.3d at 472 (Winfree, J., dissenting). Today's decision presents interesting questions about the State's duties. Does the State have a duty to seek out and advise those eligible for a § 1915(a) preference that a state court adoption petition must be filed before they will be considered? And what if, as is the case here, the State simply does not want an eligible person under § 1915(a) to have an adoptive placement preference? Can the State stand behind its view that the grandmother was not "suitable" and it therefore had no duty to assist her with an adoption petition? Or did the State breach its duty to the grandmother and the Tribe? The Tribe's concern that requiring an adoption petition for consideration under § 1915(a) will lead to a lesser effort by the State to effectuate § 1915(a) is not unfounded.

In *Tununak I* we expressly stated that the adoptive placement proceeding in this case was to determine whether Dawn would be adopted by her grandmother in the village or by her foster parents in Anchorage: "even though the placement determination took place in the context of a CINA proceeding, it is clear that the parties were essentially contesting — and the superior court was essentially determining — adoptive placement for Dawn."[28] Our decision's very substance was how to apply Alaska Adoption Rule 11, which we said applied to the proceeding.[29] And just six months later we expressed that "it was clear in [*Tununak I*] that the issue being contested at the placement review hearing was the child's placement for adoption."[30] But now the court says the grandmother's effort to obtain preferential adoptive placement — in what we said was an adoption proceeding — was not an effort to "formally" adopt Dawn because she did not file formal adoption paperwork.[31] This adherence to form over substance, especially in an ICWA context, is untenable.

---

[28] 303 P.3d at 443.

[29] *Id*. at 433, 443-44.

[30] *Irma E. v. State, Dep't of Health & Soc. Servs.*, 312 P.3d 850, 855 (Alaska 2013) (citing *Tununak I*, 303 P.3d at 439-40) (noting that in *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001), foster care placement changed into adoptive placement when superior court terminated parents' parental rights and children's foster parents filed petitions to adopt the children).

[31] The court suggests the grandmother's participation in the adoptive placement proceeding did not rise to the level of "formally [seeking] to adopt" because, comparing her efforts to those of the biological father in *Baby Girl*, the father's "much higher level of involvement" in the adoption proceedings was still insufficient to constitute a formal adoption effort. This comparison is inapt: the Supreme Court concluded the biological father "did not seek to adopt Baby Girl" because he instead sought to prevent termination of his parental rights, not because his efforts were not sufficiently formal. *Baby Girl*, 133 S. Ct. 2552, 2559 (2013).

Unlike in *Baby Girl*, where the Supreme Court took great pains showing otherwise when analyzing the two ICWA termination provisions at issue, ICWA's purpose is squarely implicated in this case. As the court notes, Dawn's biological parents are Alaska Natives. Rather than a termination of parental rights through a private adoption arranged by a non-Indian parent after an Indian parent abandoned the child, this was a state-sponsored parental rights termination and a state-sponsored adoptive placement clearly subject to ICWA.[32] And here the tribe and maternal grandmother actively sought adoptive placement with the grandmother so the child could live in the village with tribal members.[33] This case compels the application of § 1915(a)'s adoptive placement preferences, and if it does not, it is clear that ICWA is not working the way it should in Alaska.[34]

This case should be remanded to the superior court for a renewed adoption placement hearing, as we contemplated in *Tununak I*.[35] If Dawn's grandmother is a suitable adoptive placement, then, in light of § 1915(a) and absent good cause to deviate

---

[32] Like *Baby Girl*, this case "concerns a 'child custody proceeding,' which ICWA defines to include proceedings that involve 'termination of parental rights' and 'adoptive placement.' " *Id.* at 2557 n.1 (citing 25 U.S.C. § 1903(1)).

[33] *Cf. id* at 2565 (stating that ICWA "was enacted to help preserve the cultural identity and heritage of Indian tribes"); *see also In re Adoption of Sara J.*, 123 P.3d 1017, 1024 (Alaska 2005) (stating § 1915(a) established federal policy that " 'where possible, an Indian child should remain in the Indian community' " (quoting H.R. Rep. No. 95-1386, at 23, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546)).

[34] Time and time again we see CINA cases involving village children placed in urban foster homes while their parents work to meet the conditions for regaining custody; if the parents ultimately fail, the children rarely return to the village but rather are adopted, often by the foster parents, and remain in urban centers. This case is yet another example.

[35] 303 P.3d 431, 453 (Alaska 2013).

from its preferences,[36] the current adoption should be vacated and Dawn should be placed with her grandmother for eventual tribal or state court adoption.

I dissent.

---

[36]     *Cf. id.* at 451-53 (discussing factors relevant to good cause to deviate from § 1915(a)'s placement preferences).